1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| MOHAMMAD FARSHAD ABDOLLAH NIA, individually, and on behalf of all others similarly situated, | Case No. 21-cv-1799-BAS-BGS |
| Plaintiff, | **ORDER:** |
| v. | **1. DENYING MOTION FOR CLASS CERTIFICATION AND PARTIAL SUMMARY JUDGMENT (ECF No. 63);** |
| BANK OF AMERICA, N.A., a National Banking Association, | **2. GRANTING IN PART AND DENYING IN PART CROSS MOTION FOR SUMMARY JUDGMENT (ECF No. 72); AND** |
| Defendant. | **3. DENYING MOTIONS TO EXCLUDE OPINIONS (ECF Nos. 76, 79)** |

24       This action is a credit discrimination case brought by Plaintiff Mohammad Farshad

25   Abdollah Nia ("Nia" or "Plaintiff") against Defendant Bank of America, N.A. ("BANA"

26   or "Defendant").   The bulk of Nia's claims arise from BANA's customer residency

27   monitoring policy and how BANA applies it to Iranian citizens like Nia.  Nia first opened

28   a credit card account with BANA when he lived in the United States as a student.   To

21cv1799

retain his account, BANA periodically required Nia to submit various documents as proof of his continued residency in the United States. In 2019, BANA erroneously listed a document, the Form I-797C, as permanent proof of residency when it actually considered the document as temporary proof of residency. Initially, Nia submitted this form and BANA accepted it. Later in the year, although the document did not have an expiration date on its face, BANA notified Nia that the form was about to expire and requested he once again submit documentation as proof of his continued residency in the United States. Nia did not comply. Ultimately, BANA froze and then permanently closed Nia's account. Nia then sued BANA under federal and state discrimination law, as well as under federal law requiring notice of adverse credit actions.

Both Nia and BANA now move for summary judgment or partial summary judgment. (ECF Nos. 63, 72.) Additionally, Nia moves for class certification. (ECF No. 63.) Having had the benefit of oral argument last month (ECF No. 110), the Court **DENIES** Plaintiff's motion for partial summary judgment and class certification, and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment.

## I.      BACKGROUND

### A.      Factual Background

Plaintiff, a citizen of Iran, currently resident in California, brought this suit alleging various federal and state-law claims against BANA—principally for discrimination. (ECF No. 93 at 1:9–11.) Near the end of 2015, he opened a credit account with BANA. (ECF No. 63-2, Ex. 29 at 665:2.) Plaintiff continued to use this credit card account until October 2019 when BANA froze and then closed the account. (ECF No. 93 at 1:19–21.)

Since Plaintiff is an Iranian citizen and Iran is sanctioned by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), BANA periodically requested proof of Plaintiff's residence in the United States to maintain his account. (ECF No. 63-2, Ex. 24 at 621:9–15.) At BANA's behest, Nia occasionally submitted various forms of temporary proof-of-residency documentation. (*Id.*, Ex. 24 at 621:11–

14.) On April 10 and August 26, 2019, BANA sent Nia letters demanding renewed proof of residency—each of the letters mistakenly listed the Form I-797C as a *permanent* proof-of-residency document. (*Id.*, Exs. 16, 26.) In fact, BANA categorizes the Form I-797C as a *temporary* proof-of-residency document. (*Id.*, Ex. 45 at 827:10–15.) Nia submitted the Form I-797C to BANA twice: first in May 2019 and then again in September 2019. (*Id.*, Ex. 24 at 621:13–14; *id.*, Ex. 27.) In September 2019, a BANA customer-service representative reassured Nia that his account appeared to be in good order. (*Id.*, Ex. 44 at 781:17–18.) However, seven days later, BANA sent Nia another letter demanding further documentation (*id.*, Ex. 28), which Nia ignored, believing the letter "had been sent in error" (*id.*, Ex. 46 at 858:9–859:6). Subsequently, BANA froze Plaintiff's credit account on October 1, 2019, and closed it three weeks later on October 21, 2019. (*Id.*, Ex. 29 at 665:2–4.)

As a result of the closure, Plaintiff lost reward points accrued on his credit card account. (*Id.*, Ex. 32 at 696.) Plaintiff estimates that he spent close to an hour attempting to remedy the issue with BANA after it closed his account. (ECF No. 72-4, Ex. 9 at 61:13–22.)

**B.    Procedural Background**

In October 2021, BANA removed this case to federal court under federal question jurisdiction. (ECF No. 1.) In February 2023, Nia requested and was granted leave to amend his Complaint. (ECF Nos. 44, 46.) Subsequently, Nia filed a First Amended Complaint, which remains the operative complaint in this case. (ECF No. 47.) Nia seeks a determination that BANA's Customer Residency Monitoring ("CRM") policy is discriminatory and seeks an injunction preventing BANA from continuing to apply it. Under various statutes, Nia also seeks statutory damages, actual damages, punitive damages, attorneys' fees, and restitution. (*Id.* ¶¶ 41, 87, 94, 99–100, 114, 119, 133.) In Claim I, Plaintiff additionally claims that BANA violated the notice provisions of a statute, and as relief seeks statutory, actual, and punitive damages in addition to

unenumerated forms of "equitable and declaratory relief." (ECF No. 47 ¶¶ 88–94, 97, 99–100.)

After hearing oral argument, the Court resolves the parties' cross-motions for summary or partial summary judgment, as well as Plaintiff's motion for class certification. (ECF Nos. 63, 72.)

## II.   Statutory Overview

Two statutes play pivotal roles in the outcome of this case: the International Emergency Economic Powers Act ("IEEPA") and the Bank Secrecy Act ("BSA"). The Court gives an overview of each in turn.

### A.   IEEPA

Congress created IEEPA by bifurcating an older statute, the Trading with the Enemy Act ("TWEA") of 1917. 50 U.S.C. §§ 4301 *et seq.* In 1977, concerned the TWEA gave the President too much power outside of wartime, Congress split the TWEA of 1917 into (1) a new version of the TWEA and (2) a new law to govern presidential power in national emergencies: IEEPA. 50 U.S.C. §§ 1701 *et seq.*

Although IEEPA itself does not provide a section discussing its purpose, the legislative history for the act is edifying. In passing IEEPA, Congress intended to grant power to the Executive to "regulate international economic transactions during wars or national emergencies." S. Rep. No. 95-446, at 2 (1977). Congress meant it to "establish[] policies and procedures to govern the use" of the President's authority in regulating these transactions. H. Rep. No. 95-459, at 13 (1977). IEEPA was to allow the President to "regulate transactions in foreign exchange [and] banking transaction[s] involving any interest of any foreign country or a national thereof." *Id.* at 15.

In the statute itself, Congress delegates to the President the authority to create regulations to "investigate, regulate, or prohibit . . . transfers of credit or payments . . . by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof." 50 U.S.C. § 1702(a)(1)(A).

IEEPA's liability shield clause is at issue here and it reads as follows:

> Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same.  No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

*Id.* § 1702(a)(3).  The original TWEA contained this exact liability exemption.  *See id.* § 4305(b)(2).

The Supreme Court and Second Circuit reviewed and interpreted the original TWEA liability shield clause, Section 5(b)(2), and found it created a shield from liability in suits brought by government and private parties alike.  The Supreme Court, in dicta, stated that Section 5(b)(2) of the TWEA provided "specific terms" that "protected [a bank] from any liability" to customers resulting from "any infirmity" in the actions a bank takes in trying to comply with directives issued under the TWEA.  *Silesian Am. Corp. v. Clark*, 332 U.S. 469, 477 (1947); *see also McGrath v. Cities Serv. Co.*, 189 F.2d 744, 747 (2d Cir. 1951) (stating Section 5(b)(2) is a "complete protection against suits brought later in any court of the United States" by a customer).

Since then, the Third Circuit, also in dicta, stated that the IEEPA liability shield clause grants protection from civil and criminal liability to those who act in good-faith reliance on a directive issued under IEEPA.  *See United States v. Amirnazmi*, 645 F.3d 564, 573–74 (3d Cir. 2011) ("[IEEPA] exempts those who act in 'good faith' reliance on IEEPA, or on 'any regulation, instruction, or direction' issued under IEEPA, from both civil and criminal liability." (quoting 50 U.S.C. § 1702(a)(3))).

OFAC administers and enforces economic and trade sanctions, including those issued under IEEPA.  The U.S. Treasury delegated to OFAC the responsibility for developing, promulgating, and administering U.S. sanctions programs.  Accordingly, pursuant to Executive Order 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012) (issued under

IEEPA), OFAC created the sanctions regime at issue here: the Iran Transactions and Sanctions Restrictions ("ITSR"), 31 C.F.R. § 560 (2012).  The ITSR prohibit entities such as BANA from servicing, without a license, "Iranian accounts," which are defined as, among other things, accounts owned by persons who are "ordinarily resident" in Iran. *Id.* §§ 560.320, 560.427(b).

### B.    The BSA

This case also concerns the BSA.[1]  Since its original passage in 1970, Congress has amended the BSA several times by separate acts.   Critically, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, created requirements under the BSA that banks create enhanced customer due diligence programs as well as programs designed to verify customer identity,  (ECF No. 72-4, Ex. 12 at 89–90).   Generally, this means the BSA requires banks to identify and verify accountholders.   31 U.S.C. § 5318(l).   This includes having knowledge of the "name, address, and other identifying information" of bank customers.  *Id.* § 5318(l)(2).

As is the case for sanctions resulting from directives issued under IEEPA, the U.S. Treasury Department issues regulations under the BSA.  *See* 31 C.F.R. §§ 1010.100– 1010.800.   These regulations are administered by the Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), which is authorized to examine financial institutions for compliance and take enforcement actions against them for violation of those requirements.   31 U.S.C. § 5318; 31 C.F.R. § 1010.100(s).

Having set the scene, the Court now turns to the analysis.

---

[1]  The BSA was formerly known as the Currency and Foreign Transactions Reporting Act, its amendments, and the other related statutes.  These statutes are codified at 12 U.S.C. §§ 1829b, 1951–59; 18 U.S.C. §§ 1956–57, 1960; and 31 U.S.C. §§ 5311–14, 5316–32, and notes thereto.

### III.   SUMMARY JUDGMENT ANALYSIS

#### A.   Legal Standard

Summary judgment is proper on "each claim or defense—or the part of each claim or defense" when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if "particular parts of materials in the record" show that "a fact cannot be." Fed. R. Civ. P. 56(c).   "[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).   The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

When resolving a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court does not make credibility determinations or weigh conflicting evidence. *See Anderson*, 477 U.S. at 255.   The court's role at summary judgment "is to isolate and dispose of factually unsupported claims" so that they are "prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986).

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Id.* at 323.   The moving party can satisfy its burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that

party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–60 (1970); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial. *Celotex Corp.*, 477 U.S. at 324. The party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [w]here the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## B. One-Way Intervention: Plaintiff's Motion for Partial Summary Judgment and Class Certification

Defendant successfully argues that Plaintiff's motion for partial summary judgment prior to class certification is untimely and unfair on the grounds of the one-way intervention rule. (ECF No. 72-1 at 13:25–28.)

The one-way intervention rule exists to "protect defendants from unfair 'one-way intervention,' where the members of a class not yet certified can wait for the court's ruling on summary judgment and either opt in to a favorable ruling or avoid being bound by an unfavorable one." *Villa v. San Francisco Forty-Niners, Ltd.*, 104 F. Supp. 3d 1017, 1021 (N.D. Cal. 2015) (citing *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974)).

The doctrine is "one-way" because, if the plaintiff loses a pre-certification summary judgment motion, a member of the not-yet-certified class would not be bound by that decision; but, if the plaintiff wins their summary judgment motion, the putative class member could then make the decision to opt in to the winning case. *Am. Pipe*, 414 U.S. at 547 (explaining Federal Rule of Civil Procedure ("Rule") 23 was amended to

remedy this "recurrent source of abuse"); *see also Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995).

Rule 23 contains an individual notice requirement that was "intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974).  Without the one-way intervention rule, putative class members could circumvent that notice requirement by employing a "wait and see" approach, observing the results of the putative named plaintiff's pre-certification summary judgment motion before agreeing to be bound by it.  "One plaintiff could sue and lose; another could sue and lose; and another and another until one finally prevailed; then everyone else would ride on that single success." *Fireside Bank v. Superior Ct.*, 155 P.3d 268, 274 (Cal. 2007) (quotations and citation omitted).  The idea of the one-way intervention rule is to no longer leave defendants vulnerable, as the California Supreme Court has analogized, to "being pecked to death by ducks." *Id.* (quotations and citation omitted).  This doctrine continues to be applied by courts in the Ninth Circuit.  *See, e.g.*, *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1095 (N.D. Cal. 2019); *Centeno v. Quigley*, No. C14-200 MJP, 2015 WL 432537, at *2–3 (W.D. Wash. Feb. 2, 2015); *Khasin v. Hershey Co.*, No. 5:12-CV-01862-EJD, 2014 WL 1779805, at *2–3 (N.D. Cal. May 5, 2014); *Corns v. Laborers Int'l Union of N. Am.*, No. 09-CV-4403 YGR, 2014 WL 1319363, at *4–5 (N.D. Cal. Mar. 31, 2014).

Here, Defendant faces the exact one-sided risk that begs the one-way intervention rule.  The Court has not yet ruled on whether to certify Plaintiff's proposed class under Rule 23.  Therefore, Plaintiff's motion for partial summary judgment, if unsuccessful, would still allow putative class members to file their own suits against BANA in hopes of a more favorable ruling.  If Plaintiff succeeded, putative class members could opt in to the class, riding on the coattails of a winning case where they incurred none of the risk of a binding judgment against them.  This is the very "one-way intervention" problem warned of in the cases cited above.

Plaintiff claims Defendant waived the one-way intervention rule by agreeing to a briefing schedule allowing the class certification and summary judgment motions to be briefed simultaneously. (ECF Nos. 34, 40.) This argument does not hold water. Simply because motions are briefed simultaneously does not mean they must be decided simultaneously, and BANA did not waive its right to have the class certified and notified prior to a ruling on Plaintiff's motion for partial summary judgment.

A defendant waives any binding effect a judgment in its favor may have on putative class members when it moves for summary judgment prior to class certification. *See Smith v. Bayer Corp.*, 564 U.S. 299, 312 (2011) (stating that generally only parties to an action may be bound by a ruling on the merits); *see also Muhammad v. Giant Food Inc.*, 108 F. App'x 757, 765 n.5 (4th Cir. 2004) (noting that summary judgment against the named employees' individual claims only binds those employees and "does not preclude later efforts to certify a class action against [a defendant] or bar any individual claims that might be asserted in such an action" (citing *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995))). By bringing its own summary judgment motion prior to class certification, BANA has thus waived any potentially binding classwide effect.

The court in its own discretion may rule on a dispositive motion prior to class certification, which this Court shall do here. *See Saeger v. Pac. Life Ins. Co.*, 305 F. App'x 492, 493 (9th Cir. 2008). In ruling on BANA's summary judgment motion, it follows that any ruling against Nia shall not preclude future similar claims brought by putative class members on the same or similar grounds.

Thus, finding the one-way intervention rule applies, Plaintiff's motion for Partial Summary Judgment is hereby **DENIED** without prejudice. (ECF No. 63.)

## C. Reconciling the Federal Statutes

Turning to Defendant's motion for summary judgment, Plaintiff raises two claims asserting violations of federal statutes. Defendant raises compliance with various federal laws as a shield against possible liability. Where some federal statutes counsel liability

and others counsel immunity, as a matter of law, courts must either find that the statutes repeal each other or that they can be harmonized.

### 1.    Express or Implied Repeal

Where federal statutes apparently conflict, courts may find one expressly or impliedly repeals the other.  Plaintiff's federal claims fall under ECOA's general discrimination cause of action (15 U.S.C. § 1691(a) or "ECOA discrimination") and 42 U.S.C. § 1981 ("Section 1981").  In its turn, BANA asserts IEEPA and the BSA shield it from liability under Plaintiff's claims.  Here, the Court finds no indication that IEEPA, the BSA, Section 1981, or ECOA discrimination expressly repeal each other because none of the statutes' plain text expressly indicates Congressional intent to repeal other statutes.

Similarly, none of the statutes repeal the others by implication.  Courts may only find repeal by implication "when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (citing *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 456–57 (1945)).  And, where a statute does not "even hint at a wish to displace" the other, courts must read them harmoniously. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018).  As discussed below, ECOA discrimination, Section 1981, the BSA, and IEEPA may all be read together and are not irreconcilable. *See infra* Section III.C.2.  The Court further finds no indication that Congress intended for any one of the statutes to repeal the other.  Therefore, repeal by implication is impossible, and the Court must apply the "cardinal rule . . . that repeals by implication are not favored" and find neither IEEPA, the BSA, ECOA, nor Section 1981 repeals any of the others.  417 U.S. at 549–50 (citing *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936); *see also Wood v. United States*, 41 U.S. 342 (1842); *see also Universal Interpretive Shuttle Corp. v. Wash. Metro. Area Transit Comm'n*, 393 U.S. 186, 193 (1968)).

### 2.    Harmonizing the Federal Statutes

Finding no indication of Congressional intent to repeal, expressly or impliedly, any of the federal statutes, the Court must harmonize the statutes.  Where general and specific

statutes apparently conflict, they may be read in harmony by allowing the general statutes to stand as backdrops to the more specific provisions.

In a case similar to the instant action, non-Native American employees of the Bureau of Indian Affairs ("BIA") challenged an employment preference in the Indian Reorganization Act ("IRA") for hiring qualified Native Americans in the BIA. *Morton v. Mancari*, 417 U.S. 535 (1974). The plaintiffs alleged the IRA employment preference was incompatible with another statute: the Equal Employment Opportunities Act of 1972 ("EEOA"), which made it illegal for employers to hire on the basis of race. *Id.* The Court held that both statutes were valid and lawful because, whenever possible, federal statutes should be read as complementing each other. The Court found that the IRA hiring preference was "a specific provision applying to a very specific situation" while the EEOA was a statute of general application, and "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Id.* at 550–51. Applying that principle, the Supreme Court held that the IRA hiring preference could coexist as a specific provision applied in a specific situation within the EEOA's "general rule prohibiting employment discrimination on the basis of race," and allowed the IRA hiring preference to stand. *Id.* at 550.

The Seventh Circuit in *Purcell v. Bank of America* provides a helpful hypothetical to illustrate the specific provision versus general rule principle laid out in *Mancari*:

> There is no more conflict between these laws than there would be between a 1970 statute setting a speed limit of 60 for all roads in national parks and a 1996 statute setting a speed limit of 55. It is easy to comply with both: don't drive more than 55 miles per hour. Just as the later statute lowers the speed limit without repealing the first (which means that, if the second statute should be repealed, the speed limit would rise to 60 rather than vanishing), so [this later statute] reduces the scope of state regulation without repealing any other law. This understanding does not vitiate the final words of [the earlier

> statute], because there are exceptions to [the later statute].
> When it drops out, [the earlier statute] remains.

*Purcell v. Bank of Am.*, 659 F.3d 622, 625 (7th Cir. 2011).

Here, as in *Mancari*, ECOA's discrimination clause, 15 U.S.C. § 1691(a), and Section 1981 are general statutes. *See* ECOA, 15 U.S.C. § 1691(a) (prohibiting a creditor from discriminating against "any applicant . . . on the basis of . . . national origin"); *see also* 42 U.S.C. § 1981 (granting the right to "all persons" within the United States to "make and enforce contracts"). These general statutes provide "a general rule prohibiting . . . discrimination," just like the EEOA in *Mancari* provided a general rule prohibiting discrimination. *Mancari*, 417 U.S. at 550.

In contrast, IEEPA and the ITSR, as well as the BSA and its customer due diligence regulations, are specific statutes "applying to []very specific situation[s]." *Id.* at 550–51. Using IEEPA, the President established a different financial system for citizens of Iran. As in *Mancari*, here there is "no clear intention otherwise" on the part of Congress that the more general statutes of ECOA discrimination and Section 1981, both of which preceded IEEPA, will control or nullify the specific statute of IEEPA. *See id*. It follows that, as in *Mancari*, the federal statutes at hand may be harmonized.

To borrow from the *Purcell* hypothetical, the national parks statute with the speed limit of 55 miles per hour here is the ITSR, IEEPA's liability clause, and the customer due diligence requirements issued under the BSA. *See* 659 F.3d at 625. The IEEPA liability clause sets a standard that, so long as actors are working in good faith to comply with directives under IEEPA, they are shielded from liability under statutes such as ECOA discrimination and Section 1981. The ITSR lay out specific regulations for financial institutions regarding specific customers in specific situations. 31 C.F.R. §§ 560 *et seq.* The customer due diligence regulations and guidance under the BSA lay out requirements for banks to design policies that respond to the perceived risk level of customers. *Id.* § 1010.620.

However, like the national parks speed limit of 55 miles per hour discussed by *Purcell*, each of these statutes and set of regulations applies only in specific situations and to specific entities. For example, the liability clause drops out when an actor complies with IEEPA in bad faith *and* violates statutes like ECOA discrimination and Section 1981. Or, if the Iranian sanctions regime ceases to exist, IEEPA's liability shield drops out like the national park speed limit when a driver exits the park. In those cases, neither ECOA discrimination nor Section 1981 has been repealed by these more specific and tailored statutes. Instead, ECOA discrimination and Section 1981, like the general 60 miles per hour speed limit, step in to impose liability where an exception applies or where a regulation changes.

At oral argument, Plaintiff directed the Court's attention to an unpublished district court case, *Chattopadhyay*, where the court found Section 1981 and the BSA could be harmonized but not to the point where the BSA could permit "wholesale discrimination against non-citizens, particularly against the resident non-citizens in the putative class." *Chattopadhyay v. BBVA Compass Bancshares, Inc.*, No. 19-cv-01541-JST, 2019 U.S. Dist. LEXIS 241400, at *18–19 (N.D. Cal. Nov. 25, 2019). In *Chattopadhyay*, the bank refused, wholesale, to open online bank accounts for resident non-citizens with social security numbers, a restriction not required by the BSA. Thus, the adverse action faced by the plaintiffs in *Chattopadhyay* far exceeds that faced by Nia here. Congruously, the court in *Chattopadhyay* reached the same conclusion this Court reaches today—that the BSA "regulations allow financial institutions to draw some limited distinctions in the way citizens and non-citizens are treated." *Id.* at *19. Here, BANA is drawing just such permissible limited distinctions in the way citizens and non-citizens are treated.

Ultimately, ECOA discrimination and Section 1981 complement IEEPA and the BSA by providing a backdrop rule for when IEEPA and the BSA do not apply. Where IEEPA and the BSA do apply, like the IRA hiring preference in *Mancari*, they must eclipse the more general statutes of 15 U.S.C. § 1691(a) and 42 U.S.C. § 1981.

### D.     BANA's Good Faith

As discussed above, IEEPA contains a liability shield clause that offers immunity from liability for good-faith actions undertaken in attempt to comply with directives and obligations created under IEEPA.   50 U.S.C. § 1702(a)(3).   Thus, the Court must determine whether summary judgment is proper as to BANA's good-faith liability defense.

Both of the parties at oral argument agreed the IEEPA liability clause should be treated as an affirmative defense.   Finding no caselaw indicating such a clause should be treated otherwise, the Court applies it as an affirmative defense.   An affirmative defense is something "the defendant must plead and prove."   *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007)).   At the summary judgment stage, this means BANA "must show . . . that no reasonable trier of fact could fail to find" that BANA has proved its good-faith immunity defense under IEEPA.   *Rizo v. Yovino*, 854 F.3d 1161, 1165 (9th Cir. 2017) (quotations omitted), *on reh'g en banc*, 887 F.3d 453 (9th Cir. 2018), *cert. granted, judgment vacated on other grounds*, 139 S. Ct. 706 (2019).   When it comes to a good-faith immunity defense such as this one, the defendant succeeds where the plaintiff can point to "no evidence in the record that would lead a reasonable jury to conclude that [the defendant] acted in bad faith."   *Gilbert v. Kent Cnty. Mem'l Hosp.*, 64 F.4th 44, 54 (1st Cir. 2023).   In such a case, there is no genuine issue of material fact as to the defendant's good faith.   *Id.*

Acting in good faith is defined simply as "[b]ehaving honestly and frankly, without any intent to defraud or to seek an unconscionable advantage."   *Acting in good faith*, Black's Law Dictionary (11th ed. 2019).   Conversely, "bad faith" is defined as "[d]ishonesty of belief, purpose, or motive."   *Bad faith*, Black's Law Dictionary (11th ed. 2019).

In *Gilbert v. Kent County Memorial Hospital*, the First Circuit held a hospital board of trustees was shielded from liability under a good-faith immunity law similar to IEEPA's.   64 F.4th at 54.   The law in *Gilbert* provided a liability shield for hospital

boards of trustees, who acted in good faith, "to suspend, deny, revoke, or curtail the staff privileges of any staff member for good cause . . . for unprofessional conduct." 23 R.I. Gen. Laws § 23-17-23(a)–(b). The plaintiff in the case argued that the "Board did not act with an honest intention to ascertain the facts in this matter," but pointed to nothing in the record tangibly demonstrating that lack of honest intention. 64 F.4th at 54. Thus, the court found the defendant board of trustees successfully proved its good-faith immunity defense. *Id*. Similarly, here, Plaintiff can point to nothing in the record that shows a lack of honest intention by BANA in both creating and implementing its residency monitoring policy toward Iranian citizens. *Id.* For the following reasons, the Court **GRANTS** Defendant partial summary judgment as to this affirmative defense.

### 1.    IEEPA and Third-Party Actions

Preliminarily, the Court addresses Plaintiff's argument that IEEPA's liability shield clause applies only to protect defendants against government actions and not actions by third parties. (ECF No. 84 at 33:24–34:12.) This argument is nonsensical and unsupported by both the plain language of the statute and interpretation by the courts.

The plain language of the clause itself clearly does not limit the liability shield to suits brought by the government (it protects against liability for "anything done or omitted"). It states that "no person shall be held liable" and not "no person shall be held *criminally* liable." In another section of IEEPA, it provides a *mens rea* requirement for criminal prosecutions by the government for violation of IEEPA. *See* 50 U.S.C. § 1705(c). This shows Congress had in mind the distinction between civil and criminal liability when writing the statute but chose to provide a blanket liability shield under "good faith" in the liability shield clause. As such, the plain language of the clause itself suggests that it should be read as a shield against *all* suits brought by the government and third parties alike.

Moreover, as discussed above, the Supreme Court and Second Circuit read the language as a bar from liability in suits raised by third parties and not solely the government. *See supra* Section II.A. The Supreme Court in *Silesian*, when it interpreted

the original TWEA, read the facsimile liability shield clause as a shield from suits by both bank customers and government alike.  *Silesian*, 332 U.S. at 477; *see also McGrath*, 189 F.2d at 747.

Finally, Plaintiff's argument runs counter to IEEPA's purpose of protecting those who are asked to comply with emergency orders.  If companies could only be assured of protection from government prosecution but not from suits by their clients, the government would run into exactly the situation addressed by the Supreme Court in *Silesian*, where a bank was reluctant to act in compliance with regulations issued under IEEPA because it feared civil action brought by jilted customers.  *Silesian*, 332 U.S. at 477.

Therefore, this Court finds the IEEPA liability shield clause provides a shield against suits brought by third parties as well as suits brought by the government.

### 2.     The Regulatory Framework

BANA introduces undisputed evidence of its good faith in both creating and applying its policies against a backdrop of statutes and regulations that demand compliance but are vague as to how banks should achieve that compliance.

What the ITSR require.   As discussed above, the ITSR, promulgated under IEEPA's authority, prohibit entities such as BANA from servicing, without a license, "Iranian accounts," which they define as, among other things, accounts owned by persons who are "ordinarily resident" in Iran.  31 C.F.R. §§ 560.320, 560.427(b).  Neither party offers evidence of, nor can this Court find, any guidance from OFAC or another entity describing how a financial institution determines whether an individual is "ordinarily resident in Iran."  However, the ITSR make critical distinctions between how financial institutions are to treat U.S. persons, which include permanent resident aliens, *id.* § 560.314, and persons who are "ordinarily resident" in Iran, *see, e.g.*, *id.* § 560.306(c)(2).  Moreover, OFAC has made it clear that financial institutions must know whether a customer is "ordinarily resident" in Iran.  *See, e.g.*, OFAC Frequently Asked Questions 118 (July 28, 2009), https://ofac.treasury.gov/faqs/topic/1551 (stating an

account needs to be restricted where a client is ordinarily resident in Iran and present, at the time of the transaction, in Iran.)

Further, OFAC's compliance manual directs banks to structure their policies based on the banks' own risk profiles, which are driven in part by the citizenships of their customers.[2]  (ECF No. 72-4, Ex. 5 at 28.)  The compliance manual also directs banks, at customer onboarding, to develop a sanctions risk rating for customers using information provided during onboarding.  (*Id.*)  The manual also requires banks to have "internal controls" to "identify" and "escalate" any "transactions and activity that may be prohibited by OFAC."  (*Id*. at 30.)  According to the manual, due diligence with regard to customers includes diligence with respect to the customers' "geographic locations."  (*Id*. at 35.)

<u>What the BSA requires</u>.  In addition to the ITSR, banks must comply with the BSA.  Regulations promulgated under the BSA require banks to "implement a written Customer Identification Program" that "must include risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable. The procedures must enable the bank to form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. § 1020.220(a)(1)–(2).  These regulations make one distinction relevant to citizenship for banks to consider before opening a customer's account: citizens must present a taxpayer identification number, whereas non-citizens must present "one or more of the following: A taxpayer identification number; passport number and country of issuance; alien identification card number; or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard."  *Id.* § 1020.220(a)(2)(i)(A)(4)(i)–(ii).  The Customer Identification Program "must describe when the bank will use documents, non-documentary methods, or a combination of both methods" to "verify[] the identity of the

---

[2] To assist banks in evaluating whether OFAC would consider them "high-risk," OFAC published a risk matrix that lists a higher-risk customer as a "nonresident alien[], [or] a foreign individual."  31 C.F.R. Pt. 501, App. A.

customer . . . within a reasonable time after the account is opened." *Id.* § 1020.220(a)(2)(ii).  "[N]on-documentary procedures must address situations where . . . the bank is not familiar with the documents presented." *Id.* § 1020.220(a)(2)(ii)(B)(2).

Further, BSA customer due diligence regulations require a financial institution like BANA to "maintain a due diligence program . . . ." *Id.* § 1010.620(a).  That program requires BANA to "[a]scertain the identity of all nominal and beneficial owners of a private banking account." *Id.* § 1010.620(b)(1).  It also requires financial institutions to have procedures that dictate when the institution will suspend transaction activity or close the account, among other actions, when due diligence cannot be performed. *Id.* § 1010.620(d).

In 2016, FinCEN published final rules under the BSA to "clarify and strengthen customer due diligence requirements" for banks and other financial institutions. Customer Due Diligence Requirements for Financial Institutions, 81 Fed. Reg. 29398-01 (May 11, 2016); *see* 31 C.F.R. §§ 1010, 1020, 1023, 1024, 1026.  These regulations define an established customer as "[a] person with an account with the financial institution" where, if a customer does not have a taxpayer identification number, then the regulations presume the bank must have obtained an "alien identification number or passport number and country of issuance" from that customer.  31 C.F.R. § 1010.100(p). BSA/Anti-Money Laundering ("AML") due diligence further requires banks to conduct "ongoing customer due diligence," including "ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information." *Id.* § 1020.210.

Bank oversight.  The BSA requirements relate to IEEPA good-faith liability because bank regulators issue compliance guidance intended to incorporate the mandates of both regimes.  Joining together both OFAC and FinCEN regulations, the Federal Financial Institutions Examination Council ("FFIEC") conducts bank examinations and publishes the "FFIEC BSA/AML Examination Manual" ("the Examination Manual") to "provide[] guidance to examiners for carrying out BSA/AML and [OFAC]

examinations."   The   Examination   Manual   1   (2015)   (V2), https://bsaaml.ffiec.gov/docs/manual.   The FFIEC creates the Examination Manual in collaboration with FinCEN, OFAC, and other federal and state banking agencies.  *Id.* FFIEC examinations, according to the Examination Manual, include examination procedures for "examining a bank's policies, procedures, and processes for ensuring compliance with OFAC sanctions," including review of the bank's "OFAC risk assessment."  (ECF No. 72-4, Ex. 12 at 88.)

The Examination Manual gives guidance on how banks should perform this customer due diligence and titrate the type of customer information and frequency at which banks gather and update it to "the customer's risk profile," where banks gather more information "for those customers that have a higher risk profile."  The Examination Manual 1.  The timing for gathering this customer information is not specific, but the Examination Manual offers "[l]ength of time since customer information was gathered and the customer risk profile assessed" as factors that "may be relevant in determining when it is appropriate to review a customer relationship."  *Id.*  Ultimately, though, the FFIEC expects banks to have procedures establishing criteria for "when and by whom customer relationships will be reviewed, including updating customer information and reassessing the customer's risk profile."  *Id.*

The BSA/AML customer due diligence Examination Manual requirements overlap with those of OFAC.  For example, to determine a customer's risk profile, "[t]he factors the bank should consider when assessing a customer risk profile are substantially similar to the risk categories considered when determining the bank's overall risk profile."  *Id.* To determine the bank's overall risk profile, the Examination Manual points examiners to an appendix containing the same OFAC risk matrix published in the ITSR.  *Compare*  the Examination Manual 10, App. M, *with* 31 C.F.R. Pt. 501, App. A.  In another instance, the Examination Manual explains that the information collected pursuant to BSA/AML customer due diligence may be relevant to "determining OFAC sanctioned parties."  The Examination Manual 6.

In summary, banks must collect customer identification, which, in the case of non-citizens is an "alien identification number or passport number and country of issuance." 31 C.F.R. § 1010.100(p).  OFAC expects banks to use this information to determine the bank's own sanctions risk rating and to "identify" and "escalate" any "transactions and activity that may be prohibited by OFAC."  (ECF No. 72-4, Ex. 5 at 30.)  One of the things prohibited by OFAC is serving the account of an individual who is ordinarily resident in Iran and, at the time of the transaction, located in Iran.  31 C.F.R. §§ 560.320, 560.427(b).  Under the BSA, on a risk basis, banks must also maintain "ongoing customer due diligence," including the maintenance and updating of customer information.  *Id.* § 1020.210.  Although the precise frequency and content of this information update is not mandated, banks are expected to have procedures establishing criteria for when and by whom customer relationships will be reviewed, including updating customer information and reassessing the customer's risk profile.  The Examination Manual 6.  A customer's risk profile is determined via the same risk matrix OFAC uses to determine a bank's risk profile.  *Compare* the Examination Manual 10, *with* 31 C.F.R. Pt. 501, App. A.

### 3.    BANA's Policies

Plaintiff has not introduced any evidence that contradicts BANA's evidence that it was acting in good faith in interpreting the ITSR and OFAC guidance and discipline, as well as the BSA/AML law and regulations.

BANA maintains "refresh requirements" for all customers.  These requirements periodically ask the customer to confirm that the customer information the bank already has is still accurate.  (ECF No. 63-2, Ex. 45 at 789:4–12.)  As part of the refresh requirements, "[t]he bank presents the current information on file for that customer and asks the customer to confirm it or change it." (*Id.*, Ex. 45 at 789:17–21.)  If a U.S. citizen with an open credit or checking account does not confirm or change the information shown to her, then the account "would be restricted and closed."  (*Id.*, Ex. 45 at 790:6–

- 21 -

12, 790:15–791:3.)   The requirements are the same for foreign citizens of non-OFAC sanctioned countries.  (*Id.*, Ex. 45 at 791:18–792:4.)

On top of these refresh requirements, BANA maintains a CRM policy that requires citizens of OFAC-sanctioned countries to prove they do not reside in those OFAC-sanctioned countries.  (ECF No. 72-4, Ex. 16 at 142:5–143:16.)   At onboarding for a credit or checking account, BANA determines if a customer must provide BANA with proof of U.S. residency based on whether that customer is a citizen of, or gives her country of residency as, a comprehensive-sanctioned country such as Iran.[3]   (*Id.*, Ex. 16 at 144:4–23; ECF No. 63-2, Ex. 45 at 798:21–799:4.)   Those who are not citizens of OFAC-sanctioned countries and who do not reside within an OFAC-sanctioned country, whether U.S. citizens or foreign nationals, do not have to provide proof of residency to open or maintain a credit or checking account with BANA.  They must only comply with the routine refresh requirements described above.  (ECF No. 72-4, Ex. 16 at 140:2–18.)

To prove they do not reside in Iran, Iranian citizens must submit proof-of-residency documents demonstrating U.S. residency, which BANA divides into two categories: permanent or temporary.  (*Id.*, Ex. 16 at 142:5–143:16.)   BANA uses its own judgment to decide whether a proof-of-residency document is permanent or temporary.  (*Id.*, Ex. 16 at 156:19–157:7.)   If BANA deems the document to be "temporary," and the document does not have an expiration date on its face, BANA assigns the document an internal expiration date.  (*Id.*, Ex. 16 at 142:5–143:16.)   BANA does not make these internal expiration dates available to its customers.  Prior to the document's expiration date, BANA demands the customer update the temporary document to maintain her account.  (*Id.*)   In contrast, if BANA deems the document to be a "permanent" form of residency documentation, then BANA does not require further proof of U.S. residency

---

[3] BANA considers only four countries as "comprehensive-sanctioned countries"—Cuba, Iran, North Korea, and Syria—and believes it has different obligations related to these countries than for other "countries that may have an executive order for sanctions."  (ECF No. 72-4, Ex. 16 at 148:17–23.)  BANA's rationale for this distinction is that comprehensive-sanctioned countries are under sanction for the entirety of their territories whereas only certain areas of countries like Ukraine and Russia are under sanctions.  (*Id.*)

and simply requires that customer to comply with BANA's regular refresh requirements. (*Id.*)  Since August of 2016, it has "been BANA's policy that Iranian citizens' credit and checking accounts will be restricted and closed if they do not provide required proof-of-residency documentation after account opening."[4]  (*Id.*, Ex. 16 at 149:14–19.)

### 4.   BANA's Policies and Their Application to Nia

#### i.    BANA's policy

Plaintiff points to no evidence indicating that BANA's CRM policy and its application to Nia were undertaken for any purpose except to act in good faith and "pursuant to and in reliance on" the ITSR, which were in turn created pursuant to Executive Orders issued under IEEPA's authority.  50 U.S.C. § 1702(a)(3).  Thus, as a matter of law, the IEEPA liability shield clause applies here.

Plaintiff also argues that BANA did not create its CRM Policy as part of administering laws under IEEPA and therefore the liability shield clause does not apply. While Plaintiff is correct that BANA does not administer laws under IEEPA, Plaintiff's arguments are based on a misleading reading of IEEPA.  The IEEPA liability shield clause does not solely grant its liability shield to actions taken "in connection with the administration of" directives issued under IEEPA.  50 U.S.C. § 1702(a)(3).  That would only be the case if the sentence ended there.  But it does not.  The full text goes on to read "*or* pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter."  *Id.* (emphasis added).

Plaintiff rightly points out that the ITSR do not, in their text, require proof of residency on the basis of Iranian citizenship.  (ECF No. 63-1 at 22:3–4.)  However, the ITSR do not define what "ordinarily resident" in Iran means and OFAC does not prescribe exactly what bank sanctions compliance programs must look like.  OFAC requires banks to design their internal policies with the banks' risk profiles in mind—risk

---

[4] "Frozen" and "closed" carry different meanings as they pertain to adverse actions taken against customer accounts, but BANA refers to both as "restricted."  (ECF No. 72-4, Ex. 16 at 162:3–164:19.)

profiles driven by a matrix that lists having a large number of nonresident aliens as customers puts the bank into a higher risk profile.  31 C.F.R. Pt. 501, App. A.

BANA demonstrates that a bank operating in good faith could consider a customer's citizenship as a factor in determining whether that customer is ordinarily resident in Iran and could create a policy like the one BANA has.  It is entirely possible, even probable, that an Iranian citizen living in the United States without permission to stay indefinitely, such as through a Green Card, may become ordinarily resident in Iran. Even if BANA's policy is more stringent that it absolutely must be, Plaintiff does not show a genuine issue of material fact that the policy was created or implemented in bad faith.  Nothing in the record points to BANA creating its policy with even a whiff of dishonest intent.  All evidence points to BANA creating its policies with the ITSR and BSA in mind.  For instance, BANA's own 2016 internal policy manual references the ITSR.  (*See, e.g.*, ECF No. 63-2, Ex. 2 at 32.)

Geolocation technology.  Plaintiff cites nothing in the record that shows the CRM policy's creation or application to Nia came from BANA's bad faith.  Instead, he claims that because BANA *could* have pursued geolocation technology instead of a CRM policy that demonstrates bad faith.  (*See, e.g.*, ECF No. 84-2, Ex. 21 at 135–137 (showing an OFAC enforcement release where lack of geolocation tools was an aggravating factor OFAC considered in determining a compliance enforcement penalty).)  Broadly, financial institutions may use geolocation technology to identify where a customer is at the time the customer attempts to enter into a transaction.  Without going into a detailed discussion of how this technology works, Nia's argument that BANA could use only this technology and thus acted in bad faith fails for two reasons.

First, knowing a customer is in Iran when they attempt to make a transaction does not answer the critical question of the ITSR, which is whether the customer is "ordinarily resident" in Iran and thus financial institutions would be prohibited from servicing that account at all.  31 C.F.R. §§ 560.320, 560.427(b).  Therefore, geolocation technology

without some supplemental system to determine whether a customer was "ordinarily resident" in Iran would not satisfy the ITSR.

Second, even if the use of geolocation technology on its own would satisfy the "ordinarily resident" question posed by the ITSR and enforced by OFAC, that BANA could have pursued this technology rather than BANA's CRM policy does not create a genuine issue of material fact that BANA acted with an "intent to defraud or to seek an unconscionable advantage." *Bad Faith*, Black's Law Dictionary (11th ed. 2019).

The Consumer Financial Protection Bureau ("CFPB") complaints. At oral argument, Nia also averred that BANA's awareness of various CFPB complaints about its CRM Policy shows bad faith because BANA "persist[s] in their policy" despite the complaints. (ECF No. 111 at 26:18–20.) Nia's operative complaint lists a series of CFPB complaints alleging discrimination by BANA based on national origin. (ECF No. 47 ¶ 57.) None of the complaints highlighted in Nia's FAC revealed the complainant's national origin or heritage or whether they, too, were Iranian citizens. (*See generally id.*) Nia does not point to anything in the official record revealing more information about the substance of these complaints. In her deposition, Cheryl Cote ("Cote") acknowledged BANA had received and read CFPB complaints about their residency policy. (ECF No. 84-2, Ex. 33 at 186:7–25, 192:15–193:20.) Even viewing this evidence in the light most favorable to Nia, the existence of these general complaints as a matter of law does not rise to the level of bad faith displaying dishonest intent toward Iranians, which requires something more than nonspecific and unidentified customer complaints. Even accepting that BANA was aware of these complaints, that is not enough to show BANA acted in bad faith.

Federal directives to banks. As further evidence of BANA's bad faith in creating its policy, Plaintiff avers that "BANA's actions violated the directives of every federal regulator *not* to equate risk with foreign nationality." (ECF No. 84 at 35:11–13 (quotations omitted).) However, Plaintiff's evidence cited in support of this proposition fails to make that point.

Plaintiff cites to the federal banking regulators' "Joint Statement on the Risk-Based Approach to Assessing Customer Relationships and Conducting Customer Due Diligence," July 6, 2022, which reminded banks of "a longstanding position that no customer type presents a single level of uniform risk or a particular risk profile related to money laundering, terrorist financing, or other illicit financial activity." (ECF No. 63-2, Ex. 39 at 745.) First, this statement provides compliance guidance for the BSA, not the ITSR. Further, it postdates BANA's application of its policy to Nia by nearly three years and was issued after a significant change in presidential administrations. Moreover, the joint letter goes on to state that "[t]he Agencies continue to encourage banks to manage customer relationships and mitigate risks based on customer relationships, rather than decline to provide banking services to entire categories of customers." (*Id.* at 746.) BANA's policy complied with this directive—not de facto declining services to Iranian citizens, but working to mitigate risk based on customer relationships instead.

Plaintiff also cites to the Examination Manual as evidence of BANA's bad faith. (ECF No. 63-2, Ex. 40.) The manual states: "Not all customers pose the same risk, and not all customers of a particular type are automatically higher risk. . . . The federal banking agencies and FinCEN, encourage banks to manage customer relationships and mitigate risks based on those customer relationships rather than declining to provide banking services to entire categories of customers." (*Id.*, Ex. 40 at 748.) As above, this guidance postdated the actions giving rise to this case and, regardless, BANA complied with this directive by continuing to provide banking services to Iranian nationals rather than declining to provide services to them as an "entire categor[y] of customers." (*Id.*)

Plaintiff has pointed to no evidence in the record that would lead a reasonable jury to conclude that BANA acted in bad faith when it created its CRM policy.[5] *See Gilbert*, 64 F.4th at 54. None of the above shows a lack of honest intention by BANA in both

---

[5] Although the Court did not rely on the parties' experts' opinions in reaching its conclusions, it notes Nia's own expert conceded he could "definitely see in this case what Bank of America was trying to accomplish was just to comply with the ITSR." (ECF No. 79-3 at 55:8–11.)

creating and implementing its residency monitoring policy for Iranian citizens. *See id*. BANA has demonstrated, as a matter of law, that IEEPA's good-faith liability shield clause applies to BANA's creation of its CRM policy.

### ii. Application of BANA's CRM Policy to Nia

Next, the Court considers whether Nia has shown a genuine issue of material fact that BANA, in applying its CRM policy to him, acted in bad faith. Although the letters sent to Nia listed the wrong form as acceptable permanent proof of residency and BANA's customer service representatives gave Nia inaccurate information, Nia has not been able to point to anything in the record demonstrating these things happened because BANA carried "[d]ishonesty of belief, purpose, or motive." *Bad Faith*, Black's Law Dictionary (11th ed. 2019).

Instead, BANA has indisputably demonstrated that its actions were consistent with its policy. It did not count the Form I-797C as a document of permanent residency, even if it (negligently) communicated to Nia that it did. (ECF No. 63-2, Ex. 45 at 827:7–15.) Form I-797C is issued as acknowledgment of receipt of a Green Card application. That the Form I-797C was acknowledgment of receipt, and not the granting of, a Green Card does not suggest BANA should have treated the document as permanent proof of residency. Desire to remain in the country indefinitely is not equivalent to certainty that it will come to pass. Even if the Form I-797C was improperly listed as a permanent form of proof of residency, BANA sent a letter to Nia to inform him that it was insufficient (*id.*, Ex. 28)—a letter Nia ignored (*id.*, Ex. 46 at 858:16–859:10). Following its own policy, BANA then closed Plaintiff's account after he failed to renew his proof of residency. (*Id.*, Ex. 29 at 665:2–4.)

Mistakenly listing a document as adequate and then informing a customer it was inadequate does not amount to bad faith as a matter of law. (*See, e.g.*, ECF No. 63-2, Ex. 45 at 827.1:21–23 (Where Cote states she was only aware of the errors on the letter "[since] the litigation case was presented.").) Plaintiff has not pointed to anything in the record showing that listing Form I-797C as permanent proof of residency was anything

but a mistake, nor has he pointed to anything showing BANA acted with dishonest intent when it restricted and closed his account. Thus, BANA has demonstrated that it applied its CRM policy in good faith to Nia and as such is shielded from liability under IEEPA.

### E. The Federal Claims

#### 1. 42 U.S.C. § 1981 Claim

Defendant moves for summary judgment on Plaintiff's racial discrimination claim under 42 U.S.C. § 1981. As discussed above, IEEPA provides a good-faith liability shield to any potential liability related to BANA's CRM policy. Even if it did not, BANA successfully makes a case for summary judgment against Nia as it relates to Section 1981 discrimination. BANA alleges Plaintiff has failed to make a prima facie case of discrimination and has failed to produce any evidence of discriminatory intent.

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The phrase "make and enforce contracts" means "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). The rights protected by Section 1981 are protected from impairment by both "nongovernmental discrimination and impairment under color of State law." *Id.* § 1981(c).

To establish a prima facie case of discrimination under Section 1981, the plaintiff must establish that he (1) "is a member of a protected class," (2) who "attempted to contract for certain services," and (3) "was denied the right to contract for those services" because of his race or national origin. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir. 2006) (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th

- 28 -

Cir.), *opinion supplemented on denial of reh'g,* 266 F.3d 407 (6th Cir. 2001)); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

Plaintiff argues that the Court should find BANA's CRM policy is facially discriminatory and that it should therefore be treated as "dispositive evidence" of BANA's intentional discrimination, but that rule applies only to Section 1981 claims in the employment context.  (ECF No. 84 at 11:4–7.)  For Section 1981 claims outside of the employment context, the Ninth Circuit has laid out that courts must apply *McDonnell Douglas* burden-shifting when evaluating a claim of intentional discrimination.  447 F.3d at 1144–45.  Additionally, a plaintiff must prove his membership in a protected class was the but-for cause of the alleged discriminatory treatment.  *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 682–83 (2020).

Under *McDonnell Douglas*, a plaintiff must satisfy an initial burden of establishing a prima facie case for discrimination before the burden shifts to the defendant to prove it had a "legitimate non-discriminatory reason for the adverse action."  *Lindsey*, 447 at 1144.  If the defendant succeeds, the burden then shifts back to the plaintiff to establish that the defendant's non-discriminatory reason is mere pretext for intentional discrimination.  *Id.*

In addition to the three typical elements of a prima facie case, the Ninth Circuit applies a fourth element but has not yet adopted a definitive construction of it.   In *Lindsey*, the Ninth Circuit considered two options and, deciding the plaintiff's case succeeded under either construction, declined to choose one.  447 F.3d at 1145.  The first construction, used by the Seventh Circuit in *Bratton*, requires that the services remain available to similarly situated individuals who were not members of the plaintiff's protected class.  77 F.3d at 176.  The second construction, used by the Sixth Circuit in *Christian*, requires that "(a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory."  252 F.3d at 872.  Overall, "[t]he proof required to establish

- 29 -

a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Lindsey*, 447 F.3d at 1144 (quotations, citations, and emphasis omitted).

As discussed in this Court's order on the motion to dismiss, this Court applies the *Bratton* construction of the fourth element of a Section 1981 prima facie case. (ECF No. 20 at 11:15–14:4.) Plaintiff successfully demonstrates here that he meets the first three elements of a prima facie case: (1) he is an Iranian citizen and thus a member of a protected class under Section 1981, (2) he attempted to continue his contract for BANA's credit services by attempting to submit documentation to show proof of residency, and (3) he was denied the right to contract for those services when BANA restricted and closed his account.

The Court next examines whether BANA's services remain available to similarly situated individuals who are not members of Nia's protected class. BANA argues it has the same or a similar policy for citizens of other OFAC-sanctioned countries such as North Korea, Cuba, and Syria, and thus the same services do not remain available to similarly situated individuals who are not members of Nia's protected class of Iranian citizens. (ECF No. 72-1 at 17:9–19.) Rightly, Plaintiff points out that a policy that discriminates against only some subclasses within the overall class of aliens does not mean the policy is non-discriminatory.[6] *See Nyquist v. Mauclet*, 432 U.S. 1, 8 (1977); (ECF No. 63-1 at 19:6–12).

---

[6] Defendant argues Plaintiff impermissibly raises the claim that the CRM policy is discriminatory for the first time in his summary judgment motion. (ECF No. 72-1 at 28:14–29:17.) This is not the case. *See Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). Although Plaintiff should have amended his Complaint upon learning of the CRM policy and believing it to be facially discriminatory, BANA should have already been on notice that Plaintiff was attacking its CRM policy based on Plaintiff's many allusions to a discriminatory policy in his FAC and his Response in Opposition to the Motion to Dismiss. *C.f. Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000). While Plaintiff earlier conceded it was reasonable for him to have to provide proof of residency, he did not concede that BANA's policy for implementing that requirement was non-discriminatory. (ECF No. 15 at 24:17–19.) Indeed, it appears BANA *was* on notice—BANA put forth an expert to defend its CRM policy. (ECF No. 63-2, Ex. 20.) Therefore, Plaintiff here raising that the CRM policy is facially discriminatory is permissible.

Taking the facts in the light most favorable to Nia, the non-moving party, he has provided sufficient evidence to make a prima facie showing that BANA allows its services to remain available to similarly situated individuals who are non-citizens. Even though citizens of other OFAC-sanctioned countries must also submit proof of residency in the United States if they are also temporarily in the United States, it still satisfies the fourth element of the prima facie case because the similarly situated group is U.S. citizens, whom Nia shows receive different treatment. (ECF No. 72-4, Ex. 16 at 147:7–148:7.) Thus, Plaintiff has sufficiently demonstrated a prima facie case for discrimination under Section 1981.

Plaintiff also meets the causation requirement here. 590 U.S. 644. In *Bostock* the Supreme Court ruled that Title VII includes sexual orientation and gender identity discrimination as necessary offshoots of the statute's explicit protections against sex discrimination. *Id.* at 683. The Court reasoned that, but for the plaintiffs' sex, their sexual preferences and gender identity would not have incurred their employers' adverse actions. *Id.* at 659–60. "[B]ecause it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," therefore, Title VII also protected against discrimination on the basis of sexual orientation and gender identity. *Id.* at 660. Here, but for Nia's Iranian citizenship, BANA would not have then examined whether his residency in the United States was temporary or permanent, and, upon discovering it was temporary, applied its CRM policy to him, leading to the eventual restriction and closure of his account. Thus, Plaintiff has successfully shown his protected class as a non-citizen was the but-for cause of BANA's actions.

Having met the requirements of causation and demonstrated a prima facie case, the burden now shifts to BANA to provide a legitimate, non-discriminatory reason for its adverse actions against Nia. Here, BANA offers that it created its policy in response to the BSA and the ITSR, and it followed that policy when it performed the adverse actions of restricting and closing Nia's account. (ECF No. 72-1 at 6:8–11.) These are legitimate,

non-discriminatory reasons for BANA's actions. Nia, in turn, has failed to show any evidence that the policy was pretext for BANA restricting and closing his account, or that compliance with the BSA and ITSR were pretext for BANA creating the policy. Although BANA admits to mistakenly listing the Form I-797C on its list of permanent residency documents in several communications to Nia, which were form letters, Nia points to no evidence that questions BANA's credibility as to the assertion this was a mistake.

Further, the circumstantial evidence Nia points to in an effort to question BANA's credibility is insufficient. When using circumstantial evidence to demonstrate pretext, that evidence must be "specific and substantial." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). Here, the circumstantial evidence does not suffice to survive summary judgment. BANA (1) informed Nia the document was about to expire, (2) informed him that the document he submitted was unsatisfactory, (3) warned him that if he did not resolve the document issues his account would be restricted, and then (4) restricted that account. Nia points to nothing beyond BANA's mistakes in its form letters showing BANA's actions were mere pretext for its actions.

Thus, even if the IEEPA liability shield clause did not apply to protect BANA from liability under this claim, Nia has not successfully shown enough to survive summary judgment. BANA's motion for summary judgment is **GRANTED** as to Nia's 42 U.S.C. § 1981 claim.

## 2. ECOA Discrimination Claim

BANA seeks summary judgment on Plaintiff's claim that BANA violated ECOA's anti-discrimination provisions because it closed Nia's account due to his race, religion, and/or national origin. (ECF No. 47 ¶ 87.) As discussed above, IEEPA's liability shield clause applies here and shields BANA from liability under this claim. Even without the liability shield clause, though, BANA prevails on summary judgment as to this claim. BANA argues that Nia has failed to show a genuine issue of material fact that BANA discriminated against Nia on any of these grounds. (ECF No. 72-1 at 17:5–8.) At oral

argument, Plaintiff focused on a theory of discrimination based on national origin. (ECF No. 111 at 27:3–7.) As such, the Court evaluates Nia's claim under this theory.

Under ECOA, "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction" according to "race, color, religion, national origin, sex or marital status, or age . . . ." 15 U.S.C. § 1691(a). ECOA does not recognize citizenship as a protected class. *See id.* In fact, its implementing regulations specifically allow creditors to take immigration status into account in evaluating credit applications. 12 C.F.R. §§ 202.6(b)(7), 1002.6(b)(7).

To win a claim under ECOA, a plaintiff must prove: (1) he or she was an "applicant"; (2) the defendant was a "creditor"; and (3) the defendant discriminated against the plaintiff with respect to any credit transaction on the basis of plaintiff's membership in a protected class. *See Harrison v. Wells Fargo Bank, N.A.*, No. C 18-07824 WHA, 2019 WL 2515582, at *3 (N.D. Cal. June 18, 2019). A plaintiff must also prove his membership in a protected class was the but-for cause of the discriminatory treatment. *Bostock*, 590 U.S. at 682–83. ECOA does not recognize citizenship as a protected class. *See* 15 U.S.C. § 1691(a). In fact, its implementing regulations specifically allow creditors to take immigration status into account in evaluating credit applications. 12 C.F.R. §§ 202.6(b)(7), 1002.6(b)(7).

Here, the parties do not dispute Nia was an applicant and BANA was a creditor. The fly in the ointment here lies in causation—that, but for Nia's Iranian nationality, BANA would not have applied its CRM policy to him. Plaintiff argues that if the Court applies the but-for causation analysis of *Bostock* then Plaintiff has created a genuine issue of material fact as to national origin discrimination under ECOA. (ECF No. 111 at 28:16–29:13.) The analysis in *Bostock* does not help Plaintiff here. Under BANA's CRM policy, someone born in Iran who then moves to the United States and becomes a U.S. citizen would not be subject to BANA's CRM policy, which is based on citizenship and residency. (ECF No. 72-1 at 16:26–27.) In contrast, someone could be born in France, become an Iranian citizen, move to the United States, open a credit account with

- 33 -

BANA, and then be subject to BANA's CRM Policy. That person's *nationality* would be French, but it would be their Iranian *citizenship* that determined whether the CRM Policy applied to them. Here BANA's CRM policy applies based on citizenship without considering, much less discriminating based on, nationality. There is no but-for causation because nationality is not a cause. BANA does not, for instance, even ask about customers' country of birth.

Accordingly, Plaintiff fails to establish but-for causation showing that but for his nationality, BANA would not have applied its CRM policy to Nia. The Court therefore **GRANTS** Defendant summary judgment as to Plaintiff's claim under ECOA's general discrimination provision.

### 3. ECOA Notice claim

Plaintiff's ECOA notice claim survives because, unlike Plaintiff's other federal claims, the IEEPA liability shield clause does not apply to this claim because BANA did not act under IEEPA when it either did or did not send Plaintiff a letter after closing his account. Thus, the IEEPA liability shield clause does not apply.

To obtain a verdict under ECOA for improper notice, a plaintiff must show (1) an adverse action was taken against him or her and (2) proper notice was not given. *See Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1210 (9th Cir. 2013). ECOA defines an adverse action as, in relevant part, "a denial or revocation of credit." 15 U.S.C. § 1691(d)(6). A creditor can meet its notice requirement by either: (1) "providing statements of reasons in writing as a matter of course" or (2) "giving written notification . . . which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement ma y be obtained." *Id.* § 1691(d)(2). A statement of reasons must contain the specific reasons for the adverse action taken to meet this notice requirement. *Id.* § 1691(d)(3).

BANA has failed to show a reasonable jury could only find in BANA's favor as to Plaintiff's ECOA notice claim. The first element of Plaintiff's ECOA notice claim is met

- 34 -

because BANA's October 21, 2019 closure of Nia's account constitutes an adverse action under 15 U.S.C. § 1691(d)(6). BANA revoked credit when it closed his account. Further, Plaintiff establishes a genuine issue of material fact as to the second element concerning whether BANA sent Plaintiff proper notice of his account closure.

<u>Whether BANA gave Nia notice</u>. BANA claims it mailed Plaintiff a letter containing a statement of reasons for the account closure on October 22, 2019. (ECF No. 72-1 at 10:12–15.) When a party mails something, the law applies a presumption of receipt. This presumption derives from the longstanding common-law "mailbox rule." Under the mailbox rule, if a letter "properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time and was received by the person to whom it was addressed." *Rosenthal v. Walker,* 111 U.S. 185, 193 (1884); *Philadelphia Marine Trade Ass'n-Int'l Longshoremen's Ass'n Pension Fund v. Comm'r*, 523 F.3d 140, 147 (3d Cir. 2008).

However, this "is not a conclusive presumption of law." *Rosenthal*, 111 U.S. at 193–94 (citations omitted). Rather, it is a rebuttable "inference of fact, founded on the probability that the officers of the government will do their duty and the usual course of business." *Id.* (noting that when the presumption of mailing is "opposed by evidence that the letters never were received," it must be weighed "by the jury in determining the question whether the letters were actually received or not").

In the absence of actual proof of delivery, as is the case here, receipt can be proven circumstantially by introducing evidence of business practices or office customs pertaining to mail. *United States v. Hannigan*, 27 F.3d 890, 893 (3d Cir. 1994). This evidence may be in the form of a sworn statement. *Id.* at 895; *Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 420 (5th Cir. 2007) ("[A] sworn statement is credible evidence of mailing for the purposes of the mailbox rule.").

Here, the Court is presented with conflicting evidence as to whether Nia received an October 22, 2019 letter from BANA informing him that his account had been "restricted" after BANA permanently closed his account. (*Compare* ECF No. 72-1 at

10:12–15 (alleging, "BANA mailed its October 22, 2019, letter explaining the closure to Plaintiff's last reported address"), *and* ECF No. 63-2, Ex. 22 (containing a copy of the letter), *with* ECF No. 72-4, Ex. 17 at 185:19–22 (Nia stating, under oath, that he did not recall receiving the October 22, 2019 letter).)   Even where testimony is self-serving, courts "routinely and properly deny summary judgment" on its basis. *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.) ("To hold that testimony under oath by an interested party cannot be substantial evidence of a fact in that party's favor would undermine much of the law on summary judgment."), *as modified on denial of reh'g,* 425 F.3d 1292 (11th Cir. 2005).   Thus, whether the letter was sent and received represents a genuine issue of material fact.

BANA has failed to show it indisputably sent the October 22nd letter submitted in discovery.   It points to no affidavits regarding its mailing procedures, nor to any testimony by someone with personal knowledge as to the sending of the letter.   Plaintiff, meanwhile, swears he did not receive the letter.   It is not the duty of the Court to weigh evidence or determine credibility at the summary judgment stage.   Therefore, the Court will make no such determination.

Plaintiff's standing.   BANA argues Plaintiff cannot have standing regarding a letter he claims to have never received.   (ECF No. 72-1 at 23:3–4.)   In support, BANA cites *Tourgeman*, a district court case affirmed by the Ninth Circuit in an unpublished opinion, which held a plaintiff had no standing for a letter not received because it did not demonstrate a concrete harm.   *See Tourgeman v. Collins Fin. Servs., Inc.*, 197 F. Supp. 3d 1205, 1209 (S.D. Cal. 2016), *aff'd sub nom. Tourgeman v. Nelson & Kennard*, 735 F. App'x 340 (9th Cir. 2018).   Lack of a concrete harm is an attack on the first prong of the "irreducible constitutional minimum" of Article III standing laid out in *Spokeo*, which is that a plaintiff must have "suffered an injury in fact."   *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

21cv1799

Plaintiff bears the burden of demonstrating standing because he is the one invoking federal jurisdiction. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021). Plaintiff argues the injury in fact is that the October 22nd letter was never sent or received, or, in the alternative, that the letter's contents were inadequate under ECOA regardless. Plaintiff was allegedly further injured by spending two weeks after BANA closed the account "trying to satisfy BANA's demands by sending BANA his Green Card and calling BANA, only to learn for the first time on November 4[, 2019] that the account could not be reopened." (ECF No. 84 at 28:9–18.)

Since *Tourgeman*, the Ninth Circuit has held that a sufficiently concrete injury to confer standing exists where a statute protects a plaintiff's "concrete interest in receiving accurate information" and the defendant fails to provide that information. *Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 679 (9th Cir. 2021). Where a plaintiff suffers a bare violation of an informational entitlement, it is generally insufficient to demonstrate a concrete injury. *TransUnion*, 594 U.S. at 440. However, if that information has at least "some relevance" to the plaintiff, then the plaintiff has suffered a concrete injury sufficient to obtain standing. *Magadia*, 999 F.3d at 679 (citing *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 493 (6th Cir. 2019)). For instance, in *Magadia*, the court found the defendant employer harmed the plaintiff employee by withholding information as to how the defendant calculated the plaintiff's pay. Even where the defendant had not underpaid the plaintiff, the court found the plaintiff had standing because the plaintiff "lack[ed] the required information" to determine if he was being properly paid. *Id.* at 679–80; *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135 (9th Cir. 2016) ("[I]nformational injury need not result in direct pecuniary loss.").

Here, as in *Magadia*, Nia does not need to have suffered an actual pecuniary loss to have standing. Instead, he needs only to show that he was denied information to which he was entitled, and which had some relevance to him. 999 F.3d at 679. In the context of this case, Plaintiff is harmed if he can show BANA did not send him the letter it claims to have sent on October 22, 2019. If BANA did not send it, BANA deprived Plaintiff of

the right and ability to bring an ECOA notice claim because he cannot bring a claim about the contents of a letter without receiving the letter, as later discussed. *See infra*. Further, Plaintiff can show harm through the two weeks he spent after the account closure working to comply with BANA's requirements so his account would be reopened, unaware that his efforts were futile. (ECF No. 84 at 28:9–18.)  Because BANA cannot definitively show that it sent the October 22nd letter, Nia has standing.

Plaintiff does not have standing, however, as to the contents of a letter he neither received nor read.  Logically, Plaintiff cannot be injured by the contents of a letter of which he was unaware.  This commonsense understanding is supported by the Supreme Court's reasoning in *Transunion* where the Court found that plaintiffs could not be harmed by the contents of a letter they did not open.  *See* 594 U.S. at 440.  Likewise, here, Plaintiff cannot be harmed by the contents of a letter he claims he did not receive and therefore lacks standing to claim the contents of the October 22nd letter were inadequate under ECOA.

<u>Relief sought</u>.  ECOA states that those who do not comply with "any requirement" of the statute are "liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class."  15 U.S.C. § 1691e(a).  The statute also allows plaintiffs to pursue punitive damages in addition to actual damages. *Id.* § 1691e(b).  ECOA also provides for "such equitable and declaratory relief as is necessary to enforce the requirements imposed under [ECOA]."  15 U.S.C. § 1691e(c).

Plaintiff conceded at oral argument that he does not seek punitive damages for his notice claim under ECOA, only under his discrimination claim. (ECF No. 111 at 31:2–8.) As for equitable and declaratory relief for the ECOA notice violation—Plaintiff has not proposed what that relief might be to remedy the ECOA notice violation specifically. (*See* ECF No. 63-1 at 28:13–15 (requesting injunctive relief to "enjoin[] the use of Iranian citizenship to determine whether BANA customers will be subjected to its CRM Policy," which would not address an ECOA notice violation).)  As such, Plaintiff has

failed to make a showing sufficient to establish an element essential to his case for equitable or declaratory relief under ECOA's notice provision and therefore summary judgment must be granted against him.

Because the Court finds Plaintiff has met his burden to establish Article III standing and has created a genuine issue of material fact as to whether BANA sent the October 22nd letter, the Court **DENIES IN PART** Defendant's motion for summary judgment on Plaintiff's ECOA notice claim as to whether it sent the notice, but **GRANTS IN PART** summary judgment for BANA as to the contents of the letter. Further, the Court **GRANTS IN PART** BANA's summary judgment motion regarding punitive damages and any equitable or declaratory relief sought under the ECOA notice violation.

### F.    The State-Law Claims

Plaintiff raises three state-law claims under the Unruh Civil Rights Act and the California Unfair Competition Law ("UCL") in his present action and BANA moves for summary judgment as to each of them.  Unruh Civil Rights Act, Cal. Civ. Code §§ 51(b), 51.5, 52(a); California UCL, Cal. Bus. & Prof. Code §§ 17200–17210.

#### 1.    Preemption of State Claims

Because these state-law claims confront the conflicting federal laws of IEEPA and the BSA, the Court first analyzes whether these state-law claims are preempted.  BANA avers that "express, field, and conflict preemption" all bar Plaintiff's state-law claims. (ECF No. 72-1 at 34:21–22.)

The concept of federal preemption of state laws is grounded in the Supremacy Clause of the Constitution, which structures the judicial system.   Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Thus, since *M'Culloch v. Maryland*, 17 U.S. 316, 427 (1819), the federal judicial system has held "that state law that conflicts with

federal law is 'without effect,'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citing *Maryland v. Louisiana*, 451 U.S. 725 (1981)).

There are two principal kinds of preemption: express and implied. Implied preemption further breaks down into two subcategories: field and obstacle—or, conflict—preemption. Finding no express preemption provision in either the BSA or IEEPA, the Court examines only implied preemption.

### i.    Field Preemption and the Foreign Affairs Doctrine

Plaintiff's state-law claims are not preempted through field preemption because, even though California's Unruh Civil Rights Act and its UCL may incidentally intrude upon the field of foreign affairs in this instance, the laws themselves do not aim at the field and thus are not vulnerable to field preemption.

Courts find field preemption "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone*, 505 U.S. at 516 (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

The judiciary has a long history of protecting maximum national power over state power when it comes to the international arena, citing concerns "for uniformity in this country's dealings with foreign nations." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427, n.25 (1964)); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381–82, n.16 (2000); *see also Hines v. Davidowitz,* 312 U.S. 52, 63 (1941). However, Plaintiff rightly raises that "[c]ivil rights and unfair business practices are traditionally not preempted by federal law." (ECF No. 84 at 36:7–8.) This is because "[i]n order for field preemption to apply [a state law must] have more than some incidental or indirect effect in foreign countries." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012) (citations and quotations omitted). Where a state statute "is silent on matters of foreign affairs, it does not convey a distinct juristic personality from that of the United States when it comes to matters of foreign affairs" and therefore is not generally field preempted

by federal law.  *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613, 619 (9th Cir. 2013) (citations and quotations omitted).

Here, the state laws at issue, the California Unruh Civil Rights Act and the UCL, aim at areas different from foreign affairs.  The California Supreme Court has stated that the purpose of Unruh "is to create and preserve a nondiscriminatory environment in California business establishments by banishing or eradicating arbitrary, invidious discrimination by such establishments." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1025, 446 P.3d 276 (2019) (quotations omitted).  Meanwhile, the UCL exists to "discourage business practices that confer unfair advantages in the marketplace to the detriment of both consumers and law-abiding competitors." *Rose v. Bank of Am., N.A.*, 57 Cal. 4th 390, 397, 304 P.3d 181, 185 (2013).  Thus, neither of these California laws aims at the foreign arena and their effects are no more than incidental or indirect on foreign countries.  Therefore, they are not field preempted by the ITSR or the BSA.

### ii.    Obstacle/Conflict Preemption

However, to the extent BANA cannot comply with the BSA or the ITSR simultaneously with these California state laws, the state laws are necessarily preempted through conflict or obstacle preemption.

Conflict preemption exists where "compliance with both federal and state regulations is a physical impossibility." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (quotations and citations omitted).  A sufficient obstacle or conflict "is a matter of judgment" served by "examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

The Supreme Court's ruling in *Crosby* illuminates this analysis well.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  A private entity sued two Massachusetts officials, challenging the constitutionality of a Massachusetts law restricting the ability of Massachusetts and its agencies to purchase goods or services from companies doing business with Myanmar.  The Court held the Massachusetts law

was conflict preempted by a dueling federal statute imposing "mandatory and conditional sanctions on [Myanmar]." *Id.* at 368, 386.  Despite Congress's "express" command in the federal statute, the Court declined to analyze the conflicting laws under express preemption and instead applied conflict preemption.  The Court reasoned that the state law was conflict-preempted because the federal statute contained "Congress's express command to the President to take the initiative for the United States among the international community invested him with the maximum authority of the National Government." *Id.* at 375.  The case for conflict preemption was especially strong where, as here, the President's inherent authority to act in the international sphere was paired with "an express or implied authorization of Congress"—placing Presidential power "at its maximum." *Id*.  The combination precluded "any suggestion that Congress intended the President's effective voice to be obscured by state or local action." *Id.* at 380–81.  Because the state laws at issue "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments," they were necessarily preempted by the conflicting federal law. *Id.* at 381.

As discussed above, both the BSA and ITSR require banks to collect customer identification on a risk basis that explicitly categorizes non-U.S. citizens as higher-risk customers. *Supra* Section III.D.2.  Banks are directed to maintain ongoing customer due diligence whose rigor is determined by that risk basis. *Id.*  When acting in the foreign affairs arena, the federal government's power is at its zenith.  The Supreme Court has held that "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'" *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941) (citation omitted).  Accordingly, BANA demonstrates that it cannot comply with both these federal directives and the directives under Unruh and the UCL forbidding discrimination based on citizenship when that is exactly what the BSA and ITSR require.  Thus, to the extent Plaintiff bases his state

1   claims on a theory that BANA's CRM policy as created or applied is discriminatory, the

2   Court **GRANTS** summary judgment in favor of BANA.

3        **2.**      **Plaintiff's Unruh Claims:  Unruh Civil Rights Act, Cal. Civ. Code**

4        **§§ 51(b), 51.5, 52(a)**

5        Even assuming neither IEEPA's liability shield clause nor federal preemption

6   applied, Plaintiff's state law claims cannot survive BANA's motion for summary

7   judgment.  In his third and fourth causes of action, Plaintiff alleges that BANA violated

8   California's Unruh Civil Rights Act (the "Unruh Act").  Cal. Civ. Code §§ 51, 51.5,

9   52(a).  The Unruh Act prohibits certain forms of discrimination against individuals by

10   businesses.  *Id.* § 51(b) ("All persons within the jurisdiction of [California] are free and

11   equal, and no matter what their . . . ancestry, national origin, . . . citizenship, . . . or

12   immigration status are entitled to the full and equal accommodations, advantages,

13   facilities, privileges, or services in all business establishments . . . ."); *id.* § 51.5 ("No

14   business establishment . . . shall discriminate against, boycott or blacklist, or refuse to . . .

15   contract with, sell to, or trade with any person in [California] on account of [that person's

16   ancestry, national origin, citizenship, or immigration status] . . . .").  Any person

17   aggrieved may bring a suit for damages and injunctive relief against the violator.  *Id.*

18   § 52.

19        The Act was "intended as an active measure that would create and preserve a

20   nondiscriminatory environment in California business establishments by banishing or

21   eradicating arbitrary, invidious discrimination by such establishments."  *Angelucci v.*

22   *Century Supper Club*, 41 Cal. 4th 160, 167 (Cal. 2007) (quotations and citations

23   omitted).  For example, the Unruh Act prohibits discriminatory acts that "emphasize[]

24   irrelevant differences" or "perpetuate . . . stereotypes."  *Koire v. Metro Car Wash*, 40 Cal.

25   3d 24, 35–36 (1985).

26        The requirements for plaintiffs to successfully bring a claim under California Civil

27   Code § 51(b) are substantially the same as those required by § 51.5.  *Strother v. S. Cal.*

28   *Permanente Med. Grp.*, 79 F.3d 859, 875 (9th Cir. 1996), *as amended on denial of reh'g*

(Apr. 22, 1996), *as amended on denial of reh'g* (June 3, 1996) (interpreting Section 51.5 as an extension of Section 51 with the same showings and requirements).

First, a plaintiff must prove he or she is a member of a protected class under the Unruh Act. *See Doe v. State Farm Gen. Ins. Co.*, No. 3:23-CV-04734-JSC, 2023 WL 7440203, at *7 (N.D. Cal. Nov. 8, 2023). Second, a plaintiff must then prove intentional acts of discrimination. Proving disparate impact under a facially neutral policy is insufficient. *Koebke v. Bernardo Heights Country Club*, 115 P.3d 1212, 1228–29 (Cal. 2005). Third, any alleged discrimination must result from a plaintiff's relationship with the defendant in a typical customer-proprietor relationship. *Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 307–08 (Cal. Ct. App. 2021) (quoting *White*, 7 Cal. 5th at 1032).

Plaintiff easily demonstrates he meets the first and third elements of a claim under the Unruh Act and Defendant does not contest it. As such, the Court will focus on the second element: intentional discrimination.

Plaintiff argues that he only needs to prove causation to show intentional discrimination to satisfy the Unruh Act, but even the caselaw Plaintiff cites does not support this proposition. *See, e.g.*, *Maystrenko v. Wells Fargo, N.A.*, No. 21-CV-00133-JD, 2021 WL 5232221, at *3–4 (N.D. Cal. Nov. 10, 2021) (analyzing, at the motion to dismiss stage, an Unruh Act claim the same as a Section 1981 claim, which requires a *McDonnell Douglas* analysis). But-for causation is just one element and Plaintiff successfully proves it. If he were another citizen with only temporary documentation of presence in the United States, BANA would not have applied the CRM policy to him that led BANA to restrict and close his accounts. *See supra* Section III.E.1. Having already analyzed a citizenship-based discrimination claim under Section 1981 above, the Court will not repeat itself here. *Id.* As addressed above and on the evidence before the Court, Plaintiff does not succeed in demonstrating that BANA's legitimate, non-discriminatory reasons for its CRM policy and its application to Nia were pretextual under *McDonnell Douglas*. Therefore, even if the IEEPA liability shield clause did not apply to protect

BANA from liability under this claim, Nia has not successfully shown enough to survive summary judgment. BANA's motion for summary judgment is **GRANTED** as to Nia's Unruh Act claims.

### 3.     UCL Claim: Cal. Bus. & Prof. Code §§ 17200–17210

BANA argues, "Plaintiff cannot establish that BANA's policies or practices are discriminatory. His UCL claim under all three prongs—to the extent premised on discrimination—fails for those same reasons." (ECF No. 72-1 at 24:18–20.) Therefore, the Court considers if BANA has presented sufficient evidence to negate an essential element of Nia's case under the UCL or demonstrated that Nia failed to make a showing sufficient to establish an element essential to his UCL claim. *Celotex Corp.*, 477 U.S. at 322–23.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The statute is "violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).

A plaintiff may pursue a claim under California's UCL via any or all of three prongs: the "unlawful" prong, which bars practices that are forbidden by any other law; the "unfair" prong, which bars conduct that significantly threatens or harms competition; and the "fraudulent" prong, which bars practices that are likely to deceive the public. *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067 (N.D. Cal. 2021).

Preliminarily, the Court notes that Plaintiff failed to show a genuine issue of material fact that BANA created and applied its CRM policy in good faith. *Supra* Section III.D.4. Therefore, the IEEPA liability shield clause applies to all claims based on BANA's CRM policy. Furthermore, to the extent the statutes directly conflict, the UCL is preempted by the requirements of the ITSR and BSA. *Supra* Section III.F.1. This means that each of Nia's UCL claims based on the theory that BANA's CRM policy is intentionally discriminatory fails because of the IEEPA good-faith liability shield clause and federal preemption. *Supra* Sections III.D.4., III.F.1. However, Nia's ECOA

notice claim exists outside of IEEPA's good-faith liability penumbra and is itself a federal law; it thus survives summary judgment. *Supra* Section III.E.3.

### i.    Unlawful

The unlawful prong of the UCL "borrows violations of other laws and treats them as unlawful practices." *Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1139 (S.D. Cal. 2012) (quotations and citations omitted).  If a plaintiff cannot prove a violation of the underlying offense, the plaintiff's UCL claim for unlawful practices also fails.  *See Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1175 (Cal. Ct. App. 2002).

IEEPA does not wholly shield BANA from Plaintiff's claims under the UCL. BANA's actions outside of its compliance with IEEPA directives fall outside the embrace of the good-faith liability shield clause.  Thus, Plaintiff may state a claim under the UCL for violations outside of BANA's compliance with the ITSR, *e.g.*, the ECOA notice statute.  *Cf. Zhang v. Superior Ct.*, 304 P.3d 163, 166 (Cal. 2013) ("We have made it clear that while a plaintiff may not use the UCL to 'plead around' an absolute bar to relief, the [statute] does not immunize [defendants] from UCL liability for conduct that violates other laws in addition to the [statute]." (citation omitted)).

As discussed above, even discounting the IEEPA liability shield clause and federal preemption, Nia did not create a genuine issue of material fact that BANA's CRM policy or its application to Nia violated Section 1981, ECOA discrimination, or the Unruh Act. Therefore, Plaintiff may raise only his ECOA notice claim under the unlawfulness prong of the UCL.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's claims raised under the UCL unlawfulness prong based on violations of Section 1981, ECOA discrimination, and Unruh is hereby **GRANTED IN PART**; as to Plaintiff's claim raised under the UCL unlawfulness prong based on violations of ECOA's notice provision, BANA's motion for summary judgment is **DENIED IN PART**.

### ii.     Unfair

The question of whether a business practice is "unfair" under the UCL is a question of law and may be resolved on motion for summary judgment. *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 461 F. Supp. 2d 1188 (C. D. Cal. 2006), *aff'd,* 525 F.3d 822 (9th Cir. 2008).   Under the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer.  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1205 (9th Cir. 2020).

> Although the [UCL's] scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair.  Specific legislation may limit the judiciary's power to declare conduct unfair.  If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.   When specific legislation provides a "safe harbor," plaintiffs may not use the general [UCL] to assault that harbor.

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 541 (1999).

Plaintiff claims that "BANA's conduct was 'unfair,' because its Policy is facially discriminatory, which 'is dispositive evidence of intentional discrimination.'" (ECF No. 84 at 24:5–7 (citing *Rodriguez v. Procter & Gamble Co.*, 465 F. Supp. 3d 1301, 1321 (S.D. Fla. 2020)).)   Plaintiff also claims that BANA violated the UCL "by misrepresenting its CRM requirements." (ECF No. 84 at 25:4.)  BANA misstating that it accepted the Form I-797C Notice of Action as a document providing permanent proof of residency was both unfair and fraudulent, according to Nia.  (*Id.* at 25:10–26:9.)

BANA's policy is not unfair as described by the UCL.  As discussed above, that a policy is facially discriminatory is only dispositive evidence of intentional discrimination in the Title VII employment context.  *Supra* Section III.E.1.   Plaintiff has failed to

demonstrate that BANA's policy or its application to Nia was intentionally discriminatory.  Similarly, Plaintiff has failed to demonstrate that the CRM policy, born out of the ITSR and the BSA, is "oppressive or unscrupulous." *CVS Pharmacy*, 982 F.3d at 1205.  As discussed above, Nia points to no facts indicating BANA's mistakes in the form letters were anything more than mistakes—mistakes that do not rise to the level of "oppressive" or "unscrupulous." *See supra* Section III.D.4.ii.  Finally, that Nia spent some hours and lost reward points due to the CRM policy and its application to him does not outweigh BANA's reasons and justifications for instituting and maintaining its CRM policy—to comply with the ITSR and BSA and avoid enforcement actions related to those statutes.  Therefore, BANA's CRM policy and its application do not violate the UCL unfairness prong and the Court **GRANTS** BANA summary judgment as to Nia's UCL claims originating from BANA's CRM policy.

### iii.   Fraudulent

Distinct from common-law fraud, violation of California's UCL fraudulent prong requires only a showing that members of the public are likely to be deceived and that the plaintiff suffered economic injury as a result of the deception. *Beaver v. Tarsadia Hotels*, 29 F. Supp. 3d 1294 (S.D. Cal. 2014), *aff'd,* 816 F.3d 1170 (9th Cir. 2016); *Zhang v. Superior Ct.*, 304 P.3d 163, 168 (Cal. 2013).

Plaintiff claims that BANA's conduct is fraudulent under the UCL because "'[m]embers of the public are likely to be deceived' that they will not be discriminated against based on their Iranian nationality."  (ECF No. 84 at 24:15–17 (citation omitted).) Plaintiff's argument is overstated.  As discussed above, BANA places customers in its CRM program based on their citizenship and their residency status, not "solely [their] Iranian nationality." *Compare supra* Section III.D.4.i., *with* (ECF No. 84 at 24:19). Therefore, customers would not be deceived if they believed they would not be intentionally discriminated against.  BANA's motion for summary judgment regarding Nia's claim under the UCL fraudulent prong is **GRANTED**.

- 48 -

### iv.   BANA's Defenses

<u>Plaintiff's standing</u>.   To establish standing under California's UCL, plaintiffs must (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, and (2) show that economic injury was the result of the unfair business practice that is "the gravamen of the claim."   *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) (quotations and citation omitted).

BANA alleges that because Nia claims he did not receive and thus did not rely on the Oct. 22nd letter, it is "fatal to his UCL claim."   (ECF No. 72-1 at 26:27–28.) However, as discussed above, Nia demonstrates a genuine issue of material fact as to whether BANA sent the October 22nd letter, and he shows that after the account closed, he spent some time attempting to re-open the account.   Having established that lack of notice caused him to lose valuable time, Nia has sufficiently alleged standing under the UCL.

<u>Claims related to the commencement of the contract are time-barred and extra-territorial</u>.   BANA also alleges Plaintiff cannot raise UCL claims that BANA deceived him at account opening because the complaint is time-barred.   (ECF No. 91 at 5:27.) BANA further alleges that because Nia lived in Colorado at the time he opened his account with BANA, Nia cannot raise a UCL claim regarding account opening because the UCL does not apply extraterritorially.   (*Id.* at 5:24–26.)   Having already found other grounds on which BANA prevails at summary judgment, and because Nia's ECOA notice claims do not arise from the commencement of Nia's banking with BANA, the Court will not address these arguments.

### v.   Relief under the UCL

BANA also moves for summary judgment as to Plaintiff's request for injunctive relief under the UCL.   (ECF No. 84 at 38:3–6.)   "The [UCL] affords two types of relief— namely, restitution and injunctive relief.   Of the two, injunctive relief is the primary form of relief.   Relief does not, however, include damages, whether they be consequential or punitive."   *Long Beach Mem'l Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 286 Cal.

21cv1799

Rptr. 3d 419, 433 (Cal. Ct. App. 2021), *as modified* (Nov. 24, 2021); Cal. Bus. & Prof. Code § 17203.

<u>Injunctive relief</u>.  To obtain injunctive relief, the UCL requires "a threat that the wrongful conduct will continue." *Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 64 (Cal. Ct. App. 2006), *as modified on denial of reh'g* (Jan. 31, 2006).

At oral argument, Plaintiff clarified that he is requesting injunctive relief under the unfair and unlawful prongs of the UCL.  (ECF No. 111 at 31:10–19.)  The injunctive relief he seeks would be modeled after the settlement agreement in *Chattopadhyay v. BBVA.*  (*Id.* at 31:20–32:2.)  He requested an injunction "along the lines of . . . . 'Bank of America shall be and is permanently restrained and enjoined from engaging in the challenged practice alleged in Plaintiff's First Amended Complaint, defined as having a stated policy of requiring all Iranian citizens to be subject to the bank's Consumer Residency Monitoring Policy.'"  (*Id.* at 32:13–21.)

Plaintiff's request for an injunction does not correspond to any surviving claim in the instant action.  Even if it did, the requested relief enters an arena of economic policy upon which courts should not intrude.  *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn.*, 99 Cal. Rptr. 417, 422–23 (Cal. Ct. App. 1971).  It follows that the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's request for injunctive relief under the unlawful and unfair prongs of the UCL.

<u>Restitution</u>.  As for restitution, the UCL permits courts to "make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.  However, courts do not grant restitution as a form of relief under the UCL when it would be "entirely duplicative" of relief already won under other statutes. *Long Beach Mem'l Med. Ctr.*, 286 Cal. Rptr. 3d at 433.

Plaintiff's remaining claim alleges BANA violated ECOA's notice requirement.  ECOA itself provides for actual damages sustained by a plaintiff and therefore any actual damages ordered under the UCL would be duplicative.  15 U.S.C. § 1691e(a).  These

damages would cover Plaintiff's claim for the time he spent attempting to re-open his account after October 21, 2019.  (ECF No. 72-4, Ex. 9 at 61:13–21.)  It is unclear, however, if this would cover the value of Plaintiff's lost credit card rewards points or if those could only be recovered under a theory of restitution.  Neither party addresses this issue in its briefing and as such the Court reserves judgment.  Therefore, BANA's motion for summary judgment regarding Plaintiff's request for equitable relief, such as restitution, under the UCL is **DENIED**.

### IV.   CLASS CERTIFICATION

Given the sweeping nature of the preceding analysis and rulings, the Court will deny, without prejudice, Plaintiff's motion for class certification to allow Plaintiff the opportunity to revise class definitions and its motion for class certification based on his surviving claims.  The Court notes BANA's objection to personal jurisdiction by non-California class members under *Bristol-Myers Squibb*.  (ECF No. 71 at 5:11–13.) However, *Bristol-Myers* concerns mass tort actions and not nationwide class actions and thus the Court does not extend it to the case at hand.  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 278 n.4 (2017). Nevertheless, Plaintiff's motion for class certification is **DENIED** without prejudice until Plaintiff has had the opportunity to consider whether to pursue this case further as a class action and revise the class definition.  (ECF No. 63.)

### V.   CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiff's motions for partial summary judgment and class certification without prejudice.  (ECF No. 63.)

The Court **GRANTS IN PART** Defendant's motion for summary judgment as to Plaintiff's claims under ECOA's discrimination cause of action, under Section 1981, under the Unruh Act, and under several prongs of the UCL.  (ECF No. 72.)  The Court **DENIES IN PART**, without prejudice, Defendant's motion for summary judgment as it relates to Plaintiff's claim under ECOA's notice provision and all related claims under the UCL.  (*Id.*)

Further, because the Court grants summary judgment in favor of BANA as to all claims related to BANA's CRM policy, each party's Motion to Exclude the other's expert witness is **DENIED** as moot.  (ECF Nos. 76, 79.)  The Court relied on neither expert's opinions in reaching its conclusions and each expert's testimony was confined to the legitimacy of BANA's practices and policies to comply with the economic and trade sanctions regulatory regime.  As such, they are irrelevant to the remaining claims in the action and moot.

The Court **ORDERS** parties to contact the Magistrate Judge's chambers within fourteen days of today's date to coordinate future scheduling and any potential for settlement.  The Court further **ORDERS** Plaintiff to, within 30 days of this order, either renew his motion for class certification or give notice that he does not wish to pursue this case further as a class action.

**IT IS SO ORDERED.**

DATED: March 26, 2024

Hon. Cynthia Bashant
United States District Judge

- 52 -

21cv1799